Date signed September 24, 2012



NANCY V. ALQUIST
U. S. BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | | |
|---|---|---|
| In re: | * | |
| Seung Chan Park | * | Case No. 09-30497- NVA |
| Debtor. | * | (Chapter 7) |
| *　*　*　*　*　*　* | * | |
| Hyun Suk Cho and Sung Ki Cho | * | |
| Plaintiffs, | * | Adv. Pro. No. 10-0237-NVA |
| v. | * | |
| Seung Chan Park | * | |
| Defendant. | | |
| *　*　*　*　*　*　*　*　*　*　*　* | | |

**MEMORANDUM IN SUPPORT OF ORDER
<u>SUSTAINING OBJECTION TO DISCHARGE</u>**

Seung Chan Park ("Mr. Park" or the "Debtor") filed a petition for relief under Chapter 7 of

Title 11 of the United States Code (the "Bankruptcy Code") on October 26, 2009. Charles Goldstein

was appointed the chapter 7 trustee (the "Chapter 7 Trustee" or "Mr. Goldstein") in Mr. Park's

chapter 7 case.   Incident to the filing of his bankruptcy petition, Mr. Park filled out schedules and

responded to questions posed to him in the statement of financial affairs.   In schedule F, Mr. Park indicated that he owed a debt of $300,000 to Sung Ki and Hyun Suk Cho  (*See* schedule F [dkt. 1]). The basis of this debt was listed as "civil judgment."  *Id*.   No further indication is given as to the basis for this judgment.   Mr. Park's schedules further indicate that he operates a dry cleaning business, and owns 25% of the stock of that business (SCP Cleaners, Inc.) with a value that is estimated in the amount of $55,000. *See* schedule B [dkt. 1].  Mr. Park scheduled no real property. *See* schedule A [dkt. 1]. A secured liability is scheduled in the amount of $230,000, which Mr. Park indicates is for "promissory note securing S.P. Cleaners."  *See* schedule D [dkt. 1]. There are no additional assets or liabilities of comparable significance that are scheduled.

Background and Allegations

On April 13, 2010, Sung and Hyun Cho, the Plaintiffs herein, filed an adversary complaint ([dkt. 1] in the adversary proceeding) against Mr. Park seeking to deny him a discharge pursuant to § 727 (a) of the Bankruptcy Code.   Even though the Court held a multi-day evidentiary trial on this case, there was very little evidence about the nature of the debt owed by Mr. Park to the Plaintiffs.  The record indicates merely that  the Plaintiffs hold a $300,000 jury verdict against Mr. Park entered by the Circuit Court of Howard County arising from a tort suit instituted in that court by Mr. and Mrs. Cho.   The state court lawsuit involved issues stemming from Mrs. Cho's former employment by Mr. Park.

This adversary complaint was brought pursuant to 11 U.S.C. § 727(a)(3)-(5).  The complaint generally alleges that Mr. Park gave materially false statements on his bankruptcy schedules and statements, that he has failed to explain the dissipation of assets and that he has failed to keep adequate financial records.   Among other things, the Plaintiffs contend that Mr. Park failed to

disclose the sale of a parcel of real property in Korea within two years of his bankruptcy filing, failed to disclose the receipt of gross income from the operation of his business, failed to disclose non-ordinary course transfers, failed to disclose gambling losses, and failed to disclose litigation in which he was involved. Additionally, the Plaintiffs contend, despite numerous opportunities to correct the record, Mr. Park has failed to amend his schedules and adequately and truthfully respond to the inquiries therein. Accordingly, the Plaintiffs contend, Mr. Park should be denied a discharge.

<u>Jurisdictional Statement</u>

Federal district courts "have original jurisdiction but not exclusive jurisdiction of all civil proceedings arising under title 11 [of the Bankruptcy Code], or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). Section 157(a) of title 28 permits a district court to refer "any and all proceedings arising under title 11 or arising in or related to a case under title 11" to the bankruptcy judges within the district. *Id.* § 157(a). By standing order, the United States District Court for the District of Maryland has referred to the United States Bankruptcy Court for the District of Maryland all cases under the Bankruptcy Code, and all proceedings arising under the Bankruptcy Code or arising in or related to cases under the Bankruptcy Code. *See* Local Rule 402 of the Local Rules of the United States District Court of Maryland. This is a core proceeding over which this court has statutory and constitutional authority. *See Stern v. Marshall*, __ U.S. ___, 131 S. Ct. 2594 (2011). *See also In re Martinez*, 2011 WL 2925481 (Bankr. N.D. Oh. 2011) (recognizing a bankruptcy court's statutory and constitutional authority over an objection to discharge as well as an action seeking to except a debt from discharge). To the extent that it is found that this Court lacks authority to enter its order herein as a final order, the Court submits this determination as its report and recommendation to the district court.

<u>Legal Standard</u>

11 U.S.C. § 727 (a), governs the grant of a discharge in a chapter 7 case.  This statute provides, in relevant part:

(a) The Court shall grant the debtor a discharge, unless–

>(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

>(4) the debtor knowingly and fraudulently, in or in connection with the case--

>>(A) made a false oath or account;

>>(B) presented or used a false claim;

>>(C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or

>>(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

>(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities

>>*        *        *

>(7) the debtor has committed any act specified in paragraph (2), (3), (4), (5) or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the

4

Bankruptcy Act, concerning an insider[.][1]

11 U.S.C. § 727 (a) (3) - (5), (7).

Discharge provisions are liberally construed in favor of debtors and strictly against the person objecting to the discharge. *See In re Beauchamp,* 236 B.R. 727, 730 (9th Cir. B.A.P. 1999), *aff'd,* 5 Fed.Appx. 743 (9th Cir. 2001).  The discharge statute itself is subject to competing considerations.  On the one hand, the goal of bankruptcy is to provide a fresh start to an honest debtor and to relieve oppressive indebtedness.  *See In re Ingle*, 70 B.R. 979, 983 (Bankr. E.D.N.C. 1987), *citing Local Loan Co. v. Hunt*, 292 U.S. 234,244 (1934).  On the other hand, this benefit is not to be conferred on "those who play fast and loose with their assets."  *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249 (4th Cir. 1994).  The Plaintiffs, as the parties objecting to the discharge, carry the burden of demonstrating, by a preponderance of the evidence, that a ground for denying the discharge exists.  *See id.*

<u>The Alleged Misstatements</u>

The Plaintiffs allege that Mr. Park answered the following questions on his statement of financial affairs incorrectly:

> <u>Question 1</u>: When asked the gross amount of income from operation of the debtor's business from the beginning of the calendar year to the date the case was commenced, Mr. Park stated "None."  The Plaintiffs contend that this is a misstatement.

---

[1]  Although subsection (a) (7) was cited in the Complaint [dkt. 1]), the Plaintiffs did not argue that denial of discharge was appropriate pursuant to this subsection at trial.  At trial, the Plaintiffs confined their arguments to subsections (a) (3), (a) (4) and (a) (5) of section 727.  Accordingly, the Court will consider any allegations under § 727 (a) (7) to have been waived.

5

Question 8: When asked to list all losses, including losses from fire, theft, other casualty or gambling within one year preceding the filing of the bankruptcy petition, Mr. Park stated "None."  The Plaintiffs contend that this is a misstatement

Question 4: When asked to list all lawsuits to which Mr. Park was a party during the one-year period immediately preceding the filing of the bankruptcy petition, Mr. Park stated "None."  The Plaintiffs contend that this is a misstatement.

Question 10A: When asked to list all property transferred within two years immediately preceding the commencement of the case, Mr. Park stated "None."   The Plaintiffs contend that this is a misstatement.

Mr. Park defends against these allegations generally on the basis that there is a language barrier (Mr. Park is a native Korean speaker) as well as on the basis of attorney error.[2]

<u>The Evidentiary Trial</u>

It cannot seriously be contended that any of  the foregoing statements are not false and the Court so finds.  At the trial, Mr. Park admitted that, in contradiction to his schedules, he did have some income, he suffered gambling losses, he was a party to litigation including the Howard County lawsuit with the Plaintiffs as well as the foreclosure of his residence during the one-year period prior to the petition, and he sold a parcel of real property in Korea during the two-year period preceding the commencement of his case despite the fact that he responded differently in his schedules and statement of financial affairs.

---

[2]  The Court held a two-day hearing, all of which was translated into Korean and English for the benefit of all involved.  The Court would like to thank Madame translator, Ms. Kim, for her hard work and extraordinary effort in these proceedings.  Her service has been exemplary.

The Debtor's testimony as to his scheduled misstatements was at times difficult and conflicting. This underscores the nature and severity of the language issue. The Debtor testified that he is not fluent in English; he can neither read nor write the English language. Instead, he knows enough words and phrases to communicate with customers regarding dry cleaning.

Mr. Park contends that none of these misstatements was fraudulent; he emphasizes that there was no incentive to misstate any of these facts. Mr. Park and Mrs. Park testified that they have both lost their business, their home and their cars. Mr. Park also gives alternate explanations for each of his answers. For example, as to his statement that he was not a party to any lawsuit - - Mr. Park testified that he thought the Howard County lawsuit was over because a verdict had been rendered (notwithstanding that it was on appeal). As to the foreclosure of his home, he thought that the home was in his wife's name only. As to the timing of the sale of property in Korea, he simply miscalculated the date. As to the receipt of income, he was confused by the question. While one of these explanations may be plausible or excusable, there are just too many errors and inconsistencies for the Court to turn a blind eye.

In this case, even though the misstatements did not attempt to obscure a wealth of assets, the misstatements did hinder an investigation into the discovery of potential assets. The Court addresses each of the misstatements in detail:

1.     <u>Failure to Disclose Receipt of Gross Income</u>

Mr. Park responded to question number 1 on his statement of financial affairs that he had not received any gross income from the operation of his business from the beginning of the calendar year to the date the case was commenced. The Court finds that this is a misstatement. Mr. Park testified at trial that he cashed checks from his employer during the relevant time period. Transcript

February 23, 2011.  Mr. Park testified at his 341 meeting that he received between $3,200 to $3,500 per month in "take home" salary.  Plaintiffs' Exhibit 3 at 14:17-22.  Mr. Park also testified that he understood the question at the time that he answered it.  Transcript February 22, 2011.  While it is plausible that he may have been confused between "gross" and "net" income, it is not plausible that a businessperson would admit to having net income but deny having any gross income.  Net income is income *after* expenses are subtracted from gross income.  Mr. Park testified that he understood this concept.  Transcript February 22, 2011.

2.    Omissions Regarding the Sale of the Korean Property

Mr. Park responded to question number 2 on his statement of financial affairs that he had not sold any real property within two years immediately prior to the commencement of his chapter 7 case.  *See supra*.  This answer was incorrect.  In fact, Mr. Park had sold a parcel of real property in Korea during the two-year period immediately preceding the filing of his chapter 7 case.   At trial, the Plaintiffs established (and Mr. Park admitted) that Mr. Park had sold a parcel of real property in Korea on or about January 28, 2008 and received 330,000 Korean Wons (about $300,000 USD).[3]    Mr. Park testified at his deposition and at trial that he understood the question regarding the transfer of property.  *See* Plaintiffs' Exhibit 5 at 108:22 - 109; Transcript February 22, 2011.  During his 341 meeting, and again during his deposition, Mr. Park testified that he sold the Korean property approximately four years prior to the filing of his bankruptcy case (toward the end of 2007) for approximately $300,000.

---

[3]  Mr. and Mrs. Park's testimony (supported by evidence of wire transfers) supports a finding that this is the gross amount of the sale of the property.  A substantial amount, approximately $150,000 was returned to a tenant of the property upon sale in accordance with Korean law and further disbursements were made to a Korean broker, the Korean taxing authority and for closing costs. The net amount to the Parks as a result of this sale appears to have been approximately $128,000.  *See infra*.

8

*See* Plaintiffs' Exhibit 3 at 16:21- 17:3; Plaintiffs' Exhibit 5 at 77: 9-10.

At trial, Mr. Park gave inconsistent testimony about the sale of the Korean property. On direct examination he testified that he thought it had been sold three to four years prior to the filing of the case. Subsequently, on cross examination, he testified that, at the time that his original schedules and statements were filed, he thought that he had disclosed the sale of the Korean property and that he believed that it was required to be disclosed. *See* Transcript February 22, 2011. Subsequently, on re-direct examination, Mr. Park testified that at the time that he filed his bankruptcy petition, he believed that he had income from the sale of the Korean property within the past two years. *See* Transcript February 23, 2011.

      3.    Failure to Disclose Lawsuits

Mr. Park responded to question number 4 on his statement of financial affairs that he had not been a party to any lawsuits during the one-year period immediately preceding the date the case was commenced. This was a misstatement. It was established at trial that Mr. Park was a party to the civil action brought by Mr. and Mrs. Cho within the prior year as well as a foreclosure action on his residence. Transcript February 23, 2011. These misstatements could be construed as relatively innocuous standing alone. There is a somewhat reasonable explanation for them. Mr. Park testified that he did not believe that the lawsuit by Mr. and Mrs. Cho was still pending within the year prior to his bankruptcy filing because it was on appeal, and he testified that he believed that his residence was only in his wife's name. Because these statements are not isolated, but rather are part of a pattern, they evidence inattention to detail and lack of concern with the completeness and veracity of statements made under oath.

4.    Failure to Disclose Gambling Losses

Mr. Park responded to question number 8 on his statement of financial affairs that he had not sustained any losses, including losses from fire, theft, other casualty or gambling within one year preceding the filing of the bankruptcy petition.   This was a misstatement.    At trial, Mr. Park acknowledged that the response to this inquiry was incorrect.  Transcript February 23, 2011.  He also testified that he knew at the time that he filed his bankruptcy petition that he had a gambling problem.  Id.  During the trial, Mr. Park testified that he lost approximately $20,000 in 2008 and about $3,000 - $4,000 in 2009 prior to the filing of his petition.  *Id.*

With respect to the gambling losses, Mr. Park testified that he made a note to himself in Korean while the schedules and statements were being explained to him that this question referred to losses from theft.  Thus, he testified that he failed to comprehend that the question also asked for gambling losses.

5.    Failure to Disclose Transfers

Mr. Park responded to question number 10A on his statement of financial affairs that he had not transferred any property within two years immediately preceding the commencement of his bankruptcy case.  This was a misstatement.  At trial, Mr. Park testified that he had transferred $40,000 - $50,000 into SCP, Inc., his closely-held corporation that operated his dry cleaning business during the relevant time period.  Transcript February 22, 2011. This transfer was not disclosed.  At trial, Mr. Park also testified that he transferred $150,000 to a tenant in his Korean property during the relevant time period. *Id.*  This transfer was not disclosed.  At trial, Mr. Park acknowledged that he also failed to disclose the transfer of his residence in a short sale during the relevant time period.  *Id.*

The Language Barrier

It is not insignificant that Mr. Park operated under a fairly substantial handicap in that he was far from fluent in English.  Of course, this does not lessen his obligation to be truthful and complete. The Court does not intend to minimize the difficulties inherent in conducting business in a second language; to the contrary, after witnessing the language obstacles for two days first-hand, the Court recognizes the many impediments that exist when attempting to conduct business in a foreign language.  While this may put what some non-native English speakers perceive as a heightened burden on them, there is simply no other way to keep the bankruptcy system free-flowing of information and operational.  A language barrier  is not a sufficient excuse for the failure to provide  full and complete responses in the bankruptcy context.  *See Chusid v. First Union Nat'l Bank*, 1998 WL 42292 (E.D. Pa. 1998) (allegations of a language barrier did not excuse the from providing an explanation for lost assets; the court also noted that the debtor had a translator).  Mr. Park had an interpreter at his meeting of creditors and also at his deposition in connection with this adversary proceeding.[4]  This Court may be more inclined to excuse one or even a couple of misstatements as mis-translations, but there is a disturbing pattern of misstatements and omissions in this case.

The Role of the Chapter 7 Trustee

The Chapter 7 Trustee conducted an independent investigation of Mr. Park's assets and liabilities as is his charge under  § 704 of the Bankruptcy Code.   At one point during the pendency of the chapter 7 case, the Trustee moved to dismiss the chapter 7 case because Mr. Park had not

---

[4]  The fact that the Debtor was represented by bankruptcy counsel to assist him in filling out the schedules and statements, (and that counsel for Mr. Park is a Korean-speaker), should have minimized the likelihood of mistake or misunderstanding, notwithstanding Mr. Park's limited proficiency in the English language.  *See in re Sofro*, 110 B.R. 989, 991 (S.D. Fla. 1990).

11

provided certain documents requested by the Trustee. *See Motion to Dismiss* [dkt. 19] (in main case).
Subsequently, the Chapter 7 Trustee withdrew [dkt. 22] that motion.  On June 17, 2010, the Chapter
7 Trustee docketed his Report of No Distribution stating that he had made a "diligent inquiry into the
financial affairs of the debtor(s) and the location of the property belonging to the estate; and that there
is no property available for distribution from the estate over and above that exempted by law." *See*
docket in main case.   There was testimony that Mr. Goldstein was made aware of the sale of  real
property in Korea and sought additional documentation with respect to that transfer.  How, exactly,
Mr. Goldstein came to know about this transaction is not clear because  Mr. Goldstein was not called
to testify and did not testify. It is also not clear what documents Mr. Goldstein reviewed in order to
conduct his investigation.  Without additional facts, this Court cannot draw an inference that the
finding by the Chapter 7 Trustee that this was a "no asset" case supports any finding that the Debtor's
failure to disclose was de minimus, not material or unintended.


### Failure To Keep and Preserve Adequate Financial Records Pursuant to § 727 (a) (3)

A party objecting to a bankruptcy discharge on the basis that the debtor has failed to preserve
adequate financial records pursuant to § 727 (a) (3) must make an initial showing that (1) the debtor
failed to keep and preserve adequate financial records, and (2) such a failure makes it impossible to
ascertain the debtor's financial condition. *In re French,* 499 F. 3d 345, 354 (4th Cir. 2007), *citing
Meridian Bank v. Alden,* 958 F.2d 1226, 1232 (3d Cir.1992).   A debtor's financial records "need not
be perfect nor follow any particular system." *Noroian v. Hern,* 422 F.2d 1092, 1094 (9th Cir.1970).
The Fourth Circuit has instructed that § 727 (a) (3) does not require a debtor to maintain a bank
account; it simply requires that the debtor provide the trustee with the records he has, and if the debtor

12

has no records, give an explanation. *In re Shigo*, 1996 WL 405223, *2 (4th Cir. 1996).

The Court, as the trier of fact, does not apply the same standard of record-keeping to each debtor. Rather, the Court makes a determination of the adequacy of the debtor's records (and the debtor's justification for his failure to maintain records) based on "the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to debtor in his business; and any other circumstances that should be considered in the interest of justice." *In re French,* supra at 355 - 56 (internal citations omitted).

The Plaintiffs allege that a primary failure by Mr. Park concerns his failure to safeguard documents regarding the sale of the real property in Korea. Mr. Park testified that he used a broker, kept such documents as the broker forwarded to him, turned in certain original documents to the taxing authority in Korea so that funds could be taken out of the country and left some documents in the main residence prior to losing that residence in a short sale.[5]

Is it prudent not to keep records of a foreign transaction, including photocopies? Of course not. However, Mr. and Mrs. Park were doubtless undergoing a period of undue stress in selling their Korean property, trying to get the proceeds back to the United States, dealing with a business that was failing and dealing with losing the family home. Layered on this was the gambling problem with which Mr. Park was confronted. Mr. Park did not keep records of his losses. Many gamblers do not keep such records because they do not want to be confronted with the stark truth of the extent

---

[5] The Plaintiffs contend that there is approximately $29,000 from the sale of the Korean property that cannot be accounted for. This is approximately the amount that Mr. Park testified he lost gambling.

13

of their problem.[6]  While his losses should have been disclosed and estimated, this Court will not, after the fact, hold Mr. Park responsible for keeping detailed records of his losses.

As to keeping separate and accurate records of his personal finances and his business finances, Mr. Park had an obligation to account for these separately.    He operated a small dry cleaning business of which he was a part owner.  There does not appear to be any allegation that the Debtor withheld any records from either Mr. Goldstein or the Plaintiffs and it does not appear that the Debtor's record keeping was inappropriate for either himself personally or for his small business.  In fact, it was established that the Debtor engaged a CPA who kept the records for the business.  It was not established at trial that the Debtor was sophisticated or educated, merely that he ran a business that ultimately failed because a competing business (a discount dry-cleaner) moved into the same shopping center and undercut his prices.  Based on the Debtor's sophistication level, the apparent satisfaction of the Chapter 7 Trustee, and the complexity of the Debtor's business, the Court determines that the Debtor's record keeping was not inappropriate.  Accordingly, a discharge will not be denied on this basis.

---

[6]  "I'm sorry to report that the huge majority of gamblers do not keep any sort of record of their play. The truth is that a good gaming log is hard to keep up to date. When you finish gambling, you're often tired, maybe a bit bug-eyed, or even intoxicated. If you've won, you're on a high and want to celebrate, not write in a log. If you've lost, the last thing you want to do is record it for posterity. Perhaps, if you think about it at all, you figure that, whatever your result, you'll remember it if a time ever comes when you need to. Or you actually do write down your result—on a cocktail napkin that comes clean in the wash..." http://www.bjinsider.com/newsletter_95_tax.shtml

## False Oath With the Intent to Defraud Under § 727(a)(4)

In order to be denied a discharge under § 727(a)(4), "the debtor must have made a statement under oath which he knew to be false, and he must have made the statement willfully, with the intent to defraud." *Williamson v. Fireman's Fund Ins. Co.,* 828 F.2d 249, 251 (4th Cir.1987). Whether the debtor had the intent to defraud or deceive is a question of fact that the bankruptcy judge must ascertain from the facts and circumstances of the case. *Id*.

Finding intent can be difficult, especially in the face of unmitigated language barriers. The Court has asked itself: Is recklessness enough? The answer to this inquiry appears to be no, at least not in a vacuum. *See in re Khalil*, 578 F.3d 1167 (9th Cir. 2009) (recklessness combined with other circumstantial evidence may prove fraudulent intent). As the 9th Circuit B.A.P. explained the necessary finding:

> The essential point is that there must be something about the adduced facts and circumstances which suggest that the debtor intended to defraud creditors or the estate. For instance, multiple omissions of material assets or information may well support an *inference of fraud* if the nature of the assets or transactions suggests that the debtor was aware of them at the time of preparing the schedules and that there was something about the assets or transactions which, because of their size or nature, a debtor might want to conceal.

*In re Khalil*, 379 B.R. 163,175 (9th Cir. B.A.P. 2007), *aff'd*, 578 F.3d 1167 (9th Cir. 2009).

The Court believes that such considerations go more to the materiality inquiry and the Court has satisfied itself that the misstatements and omissions in this case were material. *See infra*.

In this case, the Court finds that Mr. Park made numerous misstatements on his schedules and statements. The Court does not find an express intent to defraud. Instead, the Court finds that Mr. Park was reckless. He was reckless in his failure to ensure that he understood the questions and he

was reckless in his continued and multiple misstatements.  This pattern of omissions and inaccuracies indicates a reckless disregard for the truth. *In re Hooper*, 274 B.R. 210 (Bankr. D.S.C. 2001).  A reckless indifference to the truth, as evidenced by a pattern of omissions and inaccuracies, is the functional equivalent of fraud in these circumstances.  *See In re Johnson*, 139 B.R. 163, 166 (Bankr. E.D. Va. 1992)("Statements called for in the schedules, or made under oath in answer to questions propounded during the bankruptcy's examination or otherwise, must be regarded as serious business; reckless indifference to the truth ...is the equivalent of fraud.") *Id*. at 166 quoting *In re Diorio*, 407 F.2d 1330, 1331 (2nd Cir. 1969).

   Because Mr. Park did not simply make one false statement, or even two, but rather engaged in a pattern of omissions and inaccuracies, there is sufficient recklessness for the Court to infer fraudulent intent.  *In re Wells*, 426 B.R. 579 (Bankr. N.D. Tex. 2006).  Mr. Park exacerbated his misstatements by making no effort  to correct them and amend his schedules and statement.  *See in re Hughes*, 353 B.R. 486, 504 (Bankr. N.D. Tex. 2006) (finding that debtor's failure to correct errors and omissions in schedules was "the essence of a reckless disregard for the truth"); *In re Beauchamp*, 236 B.R. 727, 733 (9th Cir. B.A.P. 1999) ("The fact of prompt correction may be evidence probative of lack of fraudulent intent); *In re Searles*, 317 B.R. 368, 377 (9th Cir. B.A.P. 2004), *aff'd*, 212 Fed. Appx. 589 (9th Cir. 2006)("Where the offending oath is contained in the schedules or required statements, the debtor's continuing duty to assure the accuracy of such schedules and statements means that the proper method of correction is a formal amendment of the schedules.").  A continuing blind indifference to the truth has been held to be reckless and the equivalent of fraud, evidencing an intent to hinder, delay and defraud.  *See in re Sofro*, 110 B.R 989 (S.D. Fla. 1990).

   In addition to being untruthful, the statements must also be material in order to support the

16

denial of a discharge. *In re McFarland*, 197 B.R. 222, 224 (Bankr E.D. Va. 1995) (a "material" false

oath is one that "bears relationship to the ...estate, concerns discovery of assets or business dealings,

or the existence and disposition of property.") *See In re Colburn*, 145 B.R. 851, 853 (Bankr. E.D.

1992). *Williamson v. Fireman's Fund Ins. Co.,* 828 F.2d 249, 252 (4th Cir. 1987) ("The false

statements related to material matters in that they concerned the existence and disposition of [the

debtor's] property"). [7]

The Court has wrestled with materiality requirement. On the one hand, the false statements

made by Mr. Park could be construed as somewhat insignificant. After all, the Chapter 7 Trustee was

able to conduct his investigation and eventually found that there were no assets in the estate for

distribution to creditors. This Court does not believe that it is appropriate, in assessing materiality,

to set a minimum benchmark of value to the estate. *See, in re Weldon*, 184 B.R. 710, 715 (Bankr.

D.S.C. 1995) (rejecting a "no harm, no foul" exception where a debtor argued that the dollar amounts

involved were not significant enough to justify a denial of discharge and the proceeds of the sale of

assets had already been spent in support of the debtor). *But see*, *In re Parker*, 85 B.R. 384 (Bankr

E.D. Va. 1988), *aff'd* 879 F.2d (4th Cir. 1989) (overruling objection to discharge where court found

that debtor's omissions of property that included (1) an account to which the debtor had limited

---

[7] In *Williamson*, the Fourth Circuit affirmed the denial of a discharge under § 727 based
on two omissions that the debtor had made in his schedules and false testimony that he gave at
his meeting of creditors. In that case, the debtor failed to list a joint bank account that he had
with his girlfriend as an account in which he had an interest and failed to list gifts that he had
made to his girlfriend. The false testimony at the meeting of creditors related to a $15,000
payment that the debtor said that he had used to repay a loan from his brother, but had actually
used to pay for a divorce lawyer for his girlfriend. *Id*. at 251. The Fourth Circuit found that "all
three of [the debtor's] false oaths were material misstatements that would support the denial of a
discharge..." *Id*. at 252. The *Williamson* Court also found it significant that the debtor made
"not one false oath, but three..." *Id*. at 253.

access, (2) household items such as a wastepaper basket and a popcorn popper and (3) small receipts aggregating less than $600 had only incidental value to the estate and were not material - - especially where the debtor had more than enough in available unused exemptions to cover the omitted property).[8]

In the instant case, the misstatements and omissions concern assets of the estate and these misstatements are of the type that would require parties in interest to conduct further investigation to uncover the true facts, even if the discovery of the truth would not lead to assets for distribution. *See In re Beaubouef*, 966 F.2d 174, 178 (5th Cir. 1992) (merely because omitted information may concern a "worthless" transaction is a specious defense because "[c]reditors are entitled to judge for themselves what will benefit, and what will prejudice, them." Even though it was not disputed that the proceeds from the sale of real property in Korea had been dissipated by the time Mr. Park filed his bankruptcy petition, parties-in-interest should not have to dig for information and conduct additional investigation in order to apprise themselves of the details of that transaction.

The truth of the schedules and the openness of the process is a laudable goal in and of itself. *In re Harlow*, 107 B.R. 528, 531 (Bankr. W.D. Va. 1989) ("The veracity of bankrupt's statements is essential to the successful administration of the Bankruptcy Code") (*citing In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984). *See also In re Weldon, supra* at 715 ("Bankruptcy law requires debtors to

---

[8]  Mr. Park has exempted non-IRA assets in the amount of $8,792.00.  This falls within his allowable exemptions under Maryland Law (as an opt-out state). *See* Md. Cts. & Jud. Proc. § 11-504.  Mr. Park also exempts his interest in two IRAs.  These are arguably exempt under Maryland law, though the treatment of IRA funds in bankruptcy has spawned a fair amount of litigation in many districts.  *See, e.g. In re Solomon*, 166 B.R. 832 (Bankr. D. Md. 1994), *aff'd sub nom. Solomon v. Cosby,* 173 B.R. 325 (D. Md. 1994), *rev'd on other grounds*, 67 F.3d 1128 (4th Cir. 1995) (proceeds of an IRA are subject to exemption under Maryland law without the necessity of tracing the deposits therein).

be honest and to take seriously the obligation to disclose all matters. The bankruptcy schedules and statements of affairs are carefully designed to elicit certain information necessary to the proper administration and adjudication of the case. To allow [a debtor] to use his discretion in determining the relevant information to disclose would create an end-run around this strictly crafted system.") A debtor can not and should not be able to shield himself with a series of untruths because they are seemingly inconsequential in the overall context of his case. The purpose of the schedules is to ensure that there is adequate information available to the debtor's creditors - - there should be no independent duty placed upon the creditors to conduct an investigation to ensure that the information in the schedules and statements is true, accurate and complete. *See in re Wells*, 426 B.R. 579 (Bankr. N.D. Tex. 2006) (creditors are entitled to rely on schedules). Creditors should not have to "drag the truth" from the debtor and the debtor should be required to abide by the "cardinal rule: when in doubt, disclose." *In re Halishak*, 337 B.R. 620, 630 (Bankr. N.D. Ohio 2005).

The Court is especially concerned in this case because of the pattern of omissions present in Mr. Park's schedules. While a motive may not be clear, the effect on the integrity of the bankruptcy process can easily be ascertained. Even so-called "innocent" mistakes cannot be taken lightly in a bankruptcy context. *See, e.g., In re Tully,* 818 F.2d 106, 112 (1st Cir. 1987) (sworn statements are "serious business.") Statements of fact given in schedules and statements are sworn under oath and, if made without meticulous attention to detail, the bankruptcy system suffers a loss of integrity. *See e.g., In re Hatton*, 204 B.R. 477, 483 (E.D. Va.. 1997).

In addition to the language barrier, Mr. Park defends his misstatements on the basis that they are the result of attorney error for which Mr. Park should not be penalized. For example, Mr. Park indicated in his response to interrogatory number 1 from the Plaintiffs that the property in Korea was

19

purchased in 2006 for $150,000.  At trial, Mr. Park testified that the Korean property was actually purchased in 2002 for $100,000.  The Plaintiffs argue, correctly, that there is simply no evidence of attorney error.  This is true.  Attorney error was raised during argument and during the opening statement on behalf of Mr. Park.   In addition, it is well-settled that a debtor is not entitled to rely on counsel and must carefully review their own schedules and statements to ensure that they are truthful and accurate.  *In re Vigil*, 414 B.R. 743 (Bankr. D.N.M. 2009).  After all, it is the debtor who signs under penalty of perjury, not counsel.  *See id.*  As to facts that a debtor swears out under penalty of perjury, attorney error is not a defense.  Mr. Park must be held accountable for his own misstatements.

### Failure to Explain Satisfactorily the Loss of Assets Pursuant to § 727 (a) (5)

Pursuant to § 727(a)(5) of the Bankruptcy Code, a debtor will be denied a discharge if the debtor fails to explain satisfactorily the loss, disappearance or deficiency of assets.  See *In re Martin,* 698 F.2d 883, 886 (7th Cir.1983).  In bringing an action under this subsection, the party objecting to the discharge has the initial burden to produce evidence establishing the basis for the objection.  Once the objecting party has met this burden, the burden shifts to the debtor for an explanation of the loss or deficiency of assets.  *See In re Ottoson-King,* 3 Fed.Appx. 147, 151, 2001 WL 167147, 3 Fed.Appx. 147 (4th Cir. 2001).  *See also*, *In re Farouki,* 14 F.3d 244, 251 (4th Cir.1994) ("In a proceeding involving Section 727(a)(5), the initial burden is on the party objecting to a discharge to produce evidence establishing the basis for his objection whereupon the burden shifts to the debtor to explain satisfactorily the loss or deficiency of assets.")

The Fourth Circuit has commented on cases that have been appropriate for denying a discharge because of the concealment of funds or the loss of assets, and this case does not present facts or

circumstances that are of a similar character and that would warrant a denial of discharge under this subsection. *See In re Thomas,* 1987 WL 37635, 3 (4th Cir. 1987) and cases cited therein, *i.e.*, *In re Dolin,* 799 F.2d 251 (6th Cir.1986) (denying debtor a discharge where debtor's only explanation for loss of over $600,000 was drug and gambling addictions); *In re Martin,* 698 F.2d 883 (7th Cir.1983) (denying debtor a discharge where debtor gave money to his father to be used as a down payment for condominium for debtor's own use); *In re Delancey,* 58 B.R. 762 (Bankr.S.D.N.Y.1986)(denying debtor a discharge where debtor claimed to have sold $400,000 worth of furs, jewelry, and art work for less than $100,000 and could not explain disposition of proceeds).

Here, the Debtor admits to having sold a parcel of real property in Korea for the equivalent of approximately $300,000 USD but does not have documentation to show what happened to the proceeds. The Debtor's wife, Mrs. Park, testified that she went to Korea to close the sale and she was given an official document by the broker that showed the disposition of the proceeds, including the return of $150,000 to the buyer, a broker's premium and the payment of taxes. She testified that she had to turn this document over to the Korean equivalent of the Internal Revenue Service in order to be able to pay the applicable taxes on the sale and to convert the sale proceeds into United States Dollars. As a result of the sale of the real property, Mr. and Mrs. Park received two international wire transfers, one on January 29, 2008 in the amount of $108,405.00 and the other on December 13, 2007 in the amount of $19,982.00. *See* Defendants' Exhibits 1 and 2, respectively.

Mr. and Mrs. Park also testified that the reason they sold the Korean property was to shore up their finances, both personal and business. As to the disposition of the $128,382.00 that they received from the sale of the Korean property, it appears that it was spent on Mrs. Park's plane ticket, to support  the business, on Mr. Park's gambling losses, and for general family support.  Mr. Park

21

testified that there was no money remaining from the sale of the Korean property at the time of the filing of this bankruptcy case.  Based on the trustee's filing of the no asset report, Mr. Park's admitted gambling problem and the testimony about the failure of Mr. Park's business and the transfer of money to the business, the Court finds that this testimony is credible.  Of course, as explained, *supra*, Mr. Park should have disclosed this information at the outset of the case.  Having done so at this late stage is barely adequate to avoid being denied a discharge under this subsection of the statute.   In the Debtor's particular circumstances, and based on his testimony at trial, the Court finds that the Debtor's explanation is adequate to avoid being denied a discharge under this subsection.

<u>**Conclusion**</u>

For the foregoing reasons, the Court will deny Seung Chan Park a discharge under section 727 (a) (4) of the Bankruptcy Code.  A separate order will enter.

**END OF MEMORANDUM**